# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 9, 2010 Session

## STATE OF TENNESSEE v. MAURICE EDWARD CARTER

**Direct Appeal from the Criminal Court for Smith County
and the Circuit Court for Rutherford County
Nos. 07-72, 07-73, F-60605
J.O. Bond, David E. Durham, and
Robert E. Corlew, III, Judges**

---

**No. M2010-00063-CCA-R3-CD - Filed August 2, 2011**

---

The defendant, Maurice Edward Carter, pled guilty in Smith County to one count of aggravated statutory rape and one count of criminal exposure to HIV for an effective sentence of twenty years. Additionally, he pled guilty in Rutherford County to four counts of aggravated sexual exploitation of a minor, two counts of solicitation of sexual exploitation of a minor, one count of statutory rape, and one count of criminal exposure to HIV for an effective sentence of twenty years, to be served concurrently with his Smith County sentences. As a condition of his guilty pleas, the defendant reserved a certified question of law pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure regarding the denial of his motions to suppress the stop and search of his automobile, and his subsequent statement to police and evidence obtained during the execution of search warrants. After review, we conclude that the record supports the findings of the trial courts that the motions to suppress were without merit and that the certified question is not dispositive of the charges against the defendant and, as a result, this court is without jurisdiction to consider the appeal. Accordingly, the appeal is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Jacky O. Bellar (on appeal and at trial) and Jamie Winkler (at trial), Carthage, Tennessee, for the appellant, Maurice Edward Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; Howard L. Chambers, Assistant

District Attorney General; and William C. Whitesell, Jr., District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arose when Smith County police officers responded to a complaint about loud music at the end of a closed road where a ferry previously had crossed the river. At the end of that road, officers found the defendant, along with several other people, including the minor male victim, C.C., sitting in cars. Upon approaching the defendant's automobile, an officer noticed a bag containing what he believed to be marijuana. After the defendant gave the officer consent to search his vehicle, a locked box was found in the backseat that contained nude pictures of C.C., the juvenile who was with the defendant in his vehicle that night. Officers subsequently searched the defendant's home, storage unit, and electronic equipment, as well as interviewed the defendant and other individuals.

As a result, in August 2007, the Smith County Grand Jury indicted the defendant on four counts of rape of a child, fourteen counts of rape, one count of contributing to the delinquency of a minor, twenty counts of criminal exposure to HIV, one count of statutory rape, and three counts of sexual exploitation of a minor. C.C.[1] was the victim in counts 1-17 and 20-36. That same month, the defendant was indicted by the Rutherford County Grand Jury on three counts of statutory rape, three counts of criminal exposure to HIV, two counts of solicitation of a minor, and ten counts of especially aggravated sexual exploitation of a minor. The victim in each count was C.C.

The defendant filed motions to suppress evidence and his statement in both Smith and Rutherford Counties. A joint hearing on the motions was conducted in Smith County by judges from both counties and at which Deputy Steve Babcock with the Smith County Sheriff's Department testified that on June 2, 2007, he was dispatched to the end of Rome Road in the Riddleton community of Smith County because of a complaint of loud music. Deputy Babcock described that Rome Road ends at the edge of a river where a ferry used to transport vehicles across the river. However, once the ferry ceased operations, the county put up a berm at the end of the road to keep vehicles from going into the river. Deputy Babcock said that he frequently patrolled that location, generally going there at least once a night.

---

[1] It is the policy of this court to refer to a minor by his or her initials.

Deputy Babcock testified that he arrived at the location shortly after midnight on June 3, and the sheriff and chief deputy also arrived at the same time. He said that he did not have his onboard video camera on, nor did he or the other officers have their blue patrol lights activated. Deputy Babcock noted that their patrol cars were parked in the road blocking the "[o]ne way in [and] one way out," but "if somebody wanted to leave they could have gone through the field where the Chief parked and got out."

At the scene, Deputy Babcock saw four vehicles "spread out in a pattern in an open area" approximately 100 feet from the berm. Three of the vehicles had two occupants each, while the fourth vehicle had only one occupant. He approached a Nissan automobile and saw the defendant and C.C. inside the vehicle. He noted that C.C. was sitting in the driver's seat and that the defendant was in the front passenger's seat. Deputy Babcock shined his flashlight into the car and observed a bag containing a green leafy substance, which he believed to be marijuana, along with rolling papers, next to the defendant's leg.[2] Deputy Babcock requested that the defendant and C.C. step out of the car and asked C.C. who owned the marijuana. C.C. replied that the marijuana was his.

Deputy Babcock testified that he asked the defendant if he was the owner of the vehicle, and the defendant replied that he was. Deputy Babcock asked the defendant for consent to search his vehicle, and "[c]onsent was given. He said it was okay." Deputy Babcock then searched the car and found another bag of marijuana in the driver's side door. The deputy asked the defendant if the marijuana was his, and the defendant "started getting kind of heavy breathing, started sweating, saying he was having chest pains, started getting upset." Deputy Babcock asked the defendant if he needed an ambulance, and the defendant replied that he did, so Deputy Babcock called for an ambulance. Deputy Babcock stopped searching the vehicle and attended to the defendant. While they waited for the ambulance, the defendant was "[b]reathing heavy, sweating, . . ., kept bending over, standing up, bending over, standing up, like he was real nervous and upset."

After it became apparent that the defendant would be leaving in an ambulance, Deputy Babcock asked the defendant whom he wanted to have tow his car, and Deputy Babcock contacted that company. Before the defendant left in the ambulance, Deputy Babcock asked the defendant again for consent to search his vehicle and informed him that he had the opportunity to withdraw his earlier consent because he would not be at the scene for the search. The defendant again stated that "it was okay" to search his vehicle.

---

[2]Deputy Babcock later testified that the bag was next to C.C.'s leg. From the whole of Deputy Babcock's testimony and the similarity in the defendant's and C.C.'s last names, it appears as though this initial response may have possibly been misheard by the court reporter and was not conflicting testimony by the deputy.

The defendant left the scene in an ambulance, and Deputies Maynard and Hale assisted Deputy Babcock in the continued search of the defendant's vehicle. In the backseat, a "new English dictionary" was found that contained nude photographs of C.C.

Deputy Ronnie Maynard with the Smith County Sheriff's Department testified that he responded to the scene at the end of Rome Road that night and assisted in searching the defendant's vehicle. Deputy Maynard found a locked box in the backseat and, when he shook it, he could tell that there was something inside. He "took [his] knife and it just opened right up." The box contained several photographs and DVDs. He showed the photographs to Deputy Babcock who identified C.C. as the individual in the photographs.

Deputy Scott Hale with the Smith County Sheriff's Department testified that he also responded to the scene at the end of Rome Road and assisted in searching the defendant's vehicle. Deputy Hale discovered two BB air pistols that were modified to look like real guns, but the items did not result in any charges being brought. Deputy Hale said that he did not have his blue patrol lights on when he arrived at the scene, nor did he have his onboard video camera activated. Deputy Hale did not see the blue patrol lights activated on any of the other patrol cars either.

In ruling on the defendant's motion to suppress the search of his vehicle, the Smith County trial court ruled that the marijuana was in plain sight in the defendant's vehicle and that the defendant gave consent to search his vehicle. The Rutherford County trial court likewise concluded that the marijuana was in plain sight and that the defendant consented to a search of his vehicle. That court also noted that because the defendant's vehicle was being towed, "an inventory search . . . likewise would further justify a search that was conducted in which the box or the dictionary book was found." The court summarized that the search, with regard to the book, was justified "incident to the finding of the substance which the officer believed to be a Class VI scheduled narcotic. Authorized also based upon the consent of the [d]efendant to the search and then based upon the inventory of the vehicle upon the vehicle being towed."

After the judges' rulings on the defendant's motions to suppress the searches, the hearing continued and the defendant called several witnesses on a "Motion to Suppress the Stop."

Sheriff Ronnie Lankford testified that he received a call that several cars were at the end of Rome Road. He and his brother, Chief Deputy Lankford, and Deputy Babcock responded at the same time, each in his own patrol car. Two other officers arrived later, each in his own patrol car. Upon their arrival, they noticed several cars there and that someone had started a fire. Deputy Babcock and Chief Lankford "went on in between the vehicles,"

while Sheriff Lankford served as backup. Sheriff Lankford did not know who ordered everyone out of the vehicles and said it was Deputy Babcock's decision as to whether anyone was free to leave.

Chief Deputy William Lankford testified that he, Sheriff Lankford, and Deputy Babcock responded to the scene because "citizens in the community . . . had called the Sheriff's Office, disturbed about the vehicles being down in the bend [and] music playing[.]" When he arrived, Chief Deputy Lankford saw four vehicles, containing a total of six individuals, gathered at the ferry landing. He explained that he and the other officers went there to disperse the crowd. He believed that the people gathered at the end of the road were violating the law because "[g]athering on a public ramp like that after midnight, . . . causing concern for the safety of the community and putting other people in distress" was the violation. Chief Deputy Lankford approached the vehicle in which the defendant and C.C. were sitting and asked C.C. for a driver's license. Meanwhile, Deputy Babcock approached from the rear of the vehicle, "gazing in the vehicles as he came along with his flashlight, checking the crowd out with his flashlight," and asked C.C. if the marijuana on the console belonged to him. Chief Lankford said that he, however, had not seen anything on the console.

Chief Deputy Lankford stated that they never told anyone that they were not free to leave. He recalled that Deputy Babcock asked the defendant and C.C. to exit their vehicle, but he did not ask any other persons to do so.

Thirty-year-old Christopher Saddler testified that he was present at the end of Rome Road the night the defendant and C.C. were arrested. He said that everyone was "just standing around talking and listening to music" when the police arrived. The music was playing from the defendant's car and the volume was "[i]n between" loud. Juveniles, some of whom were drinking beer, were present, and a fire was burning.

C.E. testified that he was present at the end of Rome Road on the night in question. He said that everyone was sitting around and talking, and they had a fire burning. It was thirty minutes past his curfew, but there was no other violation of the law taking place. He stated that everyone had gotten into their cars and was "fixing to leave" when the officers arrived. C.E. knew that C.C. was driving and did not have a driver's license.

The defendant testified that he knew that the juveniles were out past their curfew and that someone had built a fire, but he said that everyone was just sitting around and listening to music. He was in his car when the officers arrived, and Chief Lankford told him to exit his car. Chief Lankford took his driver's license and began to question him, but he had done nothing illegal that night. He alleged that the officers' blue patrol lights were on.

On cross-examination, the defendant testified that he had driven his car that night, although C.C. was sitting in the driver's seat listening to music when the officers arrived. He did not know that C.C. was out past his curfew until the officers told him or that C.C. had marijuana in his possession. The defendant acknowledged that he had nude pictures of C.C. tucked into a dictionary box in the back seat of his car. When asked whether the pictures were against the law, the defendant replied, "I guess." On redirect examination, the defendant said that he did not give consent to search his car.

In ruling on the defendant's motion to suppress the "stop," the Smith County trial court ruled that "the law is pretty clear in searching a vehicle when something is in plain sight," implicitly accrediting Deputy Babcock's testimony. The court also found that opening the locked box was "incident to this search. You're allowed to look in to that because it would be a place that drugs could be located and contraband could be found." The Rutherford County trial court ruled on the Rutherford County motion that "[w]e would find likewise." Neither of the courts ruled upon the legality of the initial interaction between the defendant and the officers, or whether it occurred by a "stop" or otherwise.

After the courts' rulings on the motions to suppress the stop, the courts heard testimony concerning the defendant's motion to suppress his statement.

Agent Jason Wilkerson, a field agent for the Tennessee Bureau of Investigation (TBI), testified that he interviewed the defendant at approximately 8:00 a.m. on the date of the encounter. Agent Wilkerson read the waiver of rights form to the defendant, and the defendant signed it. He observed that the defendant was alert and responsive during the questioning. The defendant gave both recorded and written statements. He told Agent Wilkerson that he caught C.C. smoking when he was eleven or twelve years old and used that as leverage to take photographs of C.C. by threatening to tell C.C.'s grandmother that he had been smoking. The photographs "were of a sexual nature, . . . and then over a period of time it evolved from photographs to actual physical contact and sexual activity."

Agent Wilkerson explained that the charges in Rutherford County arose against the defendant because "the activity took place in Smith County as well as he had an apartment in Rutherford County." During the interview, Agent Wilkerson showed the defendant the approximately twenty photographs that had been found in his vehicle, and the defendant identified each photograph and the location of where the photograph was taken. Some of the sexual encounters took place at a church in Smith County, some took place at the defendant's apartment in Rutherford County, and some took place in a vehicle.

Agent Wilkerson stated that the defendant also executed forms giving consent to search his residence, his storage unit, and electronic devices. He said that the defendant

never asked for an attorney, but at the end of the interview, before they started recording, he asked the defendant "in passing what he did specifically at the church that would allow him access into an office within the church, and his words were something to the effect that he didn't know if he needed representation . . . to answer that particular question." Agent Wilkerson said that he gestured to the rights form and said that they would get the defendant an attorney if he wanted one, but the defendant said, "[N]o, let's just proceed."

Detective Shannon Hunt with the Smith County Sheriff's Department testified that he was present when Agent Wilkerson advised the defendant of his rights and interviewed the defendant. Detective Hunt was also present when, "almost at the end of the interview, right before the actual electronic statement[,] [w]e [were] sitting there and he mentioned something about the Lilly Hill Baptist Church and he . . . kind of got offensive and . . . it went to possibly I might need an attorney to answer that." Detective Hunt said that Agent Wilkerson readvised the defendant of his rights and that an attorney would be provided if he wanted one, but the defendant "decided to answer questions."

On recross examination, Detective Hunt acknowledged that the transcript of the preliminary hearing reflected that Detective Hunt had answered, "Yes," to a question concerning whether the defendant had said that he needed an attorney, and he never indicated that the defendant said he "might" need an attorney.

The defendant testified that he asked for an attorney "at the beginning of the interrogation." He made the request after Agent Wilkerson "showed [him] the very first photograph," but Agent Wilkerson "went ballistic and . . . told [him] that this only makes [him] look like [a] pedophile and that if [he] g[o]t an attorney involved that it wouldn't go good for [him]." The defendant said that he started to have an anxiety attack and explained to Agent Wilkerson that he had not had his anti-anxiety medication.

On cross-examination, the defendant stated that he did not sign the waiver of his rights until after the initial interview. He said that Agent Wilkerson kept asking him questions, even after he asked for an attorney, to the point that he started having an anxiety attack. With regard to the consents to search his home, storage unit, and electronics, the defendant said that "[t]hey started throwing papers down in front of [him] . . . and . . . [he] was kind of intimidated by them and . . . just d[id] what they told [him]. [He] didn't know if they w[ere] going to take [him] to the back and beat [him] up or something."

Agent Wilkerson was recalled to testify that he did not do the things alleged by the defendant. Agent Wilkerson said that he clarified the defendant's statement regarding counsel and did not take it to be an unequivocal request for an attorney.

In denying the defendant's Smith County motion to suppress his statement, the Smith County trial court ruled that the officers followed the rules correctly and that the defendant decided to "go ahead with the waiver and answer the questions." The court discredited the defendant's testimony that Agent Wilkerson had "holler[ed] and yell[ed]" at him. The Rutherford County trial court ruled on the Rutherford County motion that the defendant made an equivocal statement regarding an attorney, Agent Wilkerson clarified the statement in accordance with the law, and Agent Wilkerson did not behave inappropriately as alleged by the defendant.

The defendant subsequently filed motions in Smith County to reconsider his motions to suppress the evidence and his statement. The trial court, also incorporating the reasons stated by the judges previously reviewing the claims, ruled on the motion to suppress the search of the defendant's vehicle that the officer had probable cause to believe that he saw marijuana in the defendant's vehicle, making the search of the vehicle proper. In ruling on the motion to suppress the defendant's statement, the trial court at the rehearing, concurring with the courts at the initial hearing, found that the defendant had received and waived his <u>Miranda</u> warnings.

On December 7, 2009, the defendant entered a petition to plead guilty in the Smith County case, while reserving a certified question of law. Per the agreement, the defendant pled guilty to one count of aggravated statutory rape for a twelve-year sentence, served at 60%, and to one count of criminal exposure to HIV for an eight-year sentence, served at 35%. C.C. was the victim in both of those counts. The sentences were to run consecutively for an effective term of twenty years. On March 1, 2010, the defendant entered a petition to plead guilty in the Rutherford County case, while reserving a certified question of law. Per the agreement, the defendant pled guilty to four counts of aggravated sexual exploitation of a minor for a five-year sentence on each count, one count of statutory rape for a one-year sentence, one count of criminal exposure to HIV for a five-year sentence, and two counts of solicitation of sexual exploitation of a minor for a one-year sentence on each count. All of the sentences were to be served at 30%. The defendant's four aggravated sexual exploitation of a minor sentences were to be served consecutively to each other but concurrently to the sentences for statutory rape, criminal exposure to HIV, and solicitation of a minor for an effective term of twenty years. The defendant's Rutherford County sentences were to be served concurrently to his Smith County sentences.

The certified question reserved by the defendant in both sets of cases was as follows:

Whether the stop and subsequent warrantless search of the Defendant's Nissan automobile on June 3, 2007, by officers in Smith County, Tennessee, was unreasonable; violated the Defendant's Fourth Amendment rights to the United

States and Tennessee Constitutions; was performed without probable cause nor based upon a reasonable suspicion supported by articulable facts; was a pretext to perform an illegal search; was unreasonable in the time[,] manner and scope of the investigation; was done without lawful consent; and was unlawful. Whether the evidence obtained from the stop and subsequent warrantless search, including statements and evidence obtained from search warrants based on evidence from the search, were obtained unlawfully and subject to suppression and, if so, whether the trial court erred in failing to suppress the evidence and statements.

This court has consolidated the appeals from the trial courts.

## ANALYSIS

Rule 37(b)(2) of the Tennessee Rules of Criminal Procedure provides that an appeal lies from any judgment of conviction upon a plea of guilty or nolo contendere if:

(A) [T]he defendant entered into a plea agreement under Rule 11(a)(3) but explicitly reserved-with the consent of the state and of the court-the right to appeal a certified question of law that is dispositive of the case, and the following requirements are met:

(i) the judgment of conviction or other document to which such judgment refers that is filed before the notice of appeal, contains a statement of the certified question of law that the defendant reserved for appellate review;

(ii) the question of law is stated in the judgment or document so as to identify clearly the scope and limits of the legal issue reserved;

(iii) the judgment or document reflects that the certified question was expressly reserved with the consent of the state and the trial court; and

(iv) the judgment or document reflects that the defendant, the state, and the trial court are of the opinion that the certified question is dispositive of the case[.]

Tenn. R. Crim. P. 37(b)(2)(A). In State v. Preston, 759 S.W.2d 647 (Tenn. 1988), our supreme court emphasized that the burden is on the defendant to ensure that the conditions for properly preserving a question of law pursuant to Rule 37 have been met:

This is an appropriate time for this Court to make explicit to the bench and bar exactly what the appellate courts will hereafter require as prerequisites to the consideration of the merits of a question of law certified pursuant to Tenn. R. Crim. P. 37(b)(2)(i) or (iv). Regardless of what has appeared in prior petitions, orders, colloquy in open court or otherwise, the final order or judgment from which the time begins to run to pursue a T.R.A.P. 3 appeal must contain a statement of the dispositive certified question of law reserved by defendant for appellate review and the question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved. For example, where questions of law involve the validity of searches and the admissibility of statements and confessions, etc., the reasons relied upon by defendant in the trial court at the suppression hearing must be identified in the statement of the certified question of law and review by the appellate courts will be limited to those passed upon by the trial judge and stated in the certified question, absent a constitutional requirement otherwise. . . . No issue beyond the scope of the certified question will be considered.

Id. at 650.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. (citations omitted).

In reviewing a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." Keith, 978 S.W.2d at 864. The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

**Stop of the Defendant's Vehicle**

In his brief, the defendant argues that "the officers seized [him], along with all parties present in the parking area, immediately upon arriving at the scene." However, the question of when the defendant was "seized" was neither raised in the certified question nor ruled upon by the trial courts considering the defendant's motions to suppress. Accordingly, that issue is not before this court. We will review the defendant's claim that the "stop" of his vehicle was illegal.

The certified question views the initial interaction between the defendant and police officers as occurring after their "stop" of his vehicle. However, the testimony of all witnesses, including the defendant, was that his vehicle was parked in a public place when officers approached. The trial courts did not specifically make any findings about the initial interaction between the officers and the defendant, such as whether the officers seized the defendant through physical force or show of authority. Instead, both trial courts went straight to ruling that the marijuana was in plain sight in the defendant's vehicle, thus allowing the search of the defendant's vehicle. The defendant did not ask the judges to elaborate on or clarify their rulings. This court has previously stated that, as to a certified question, appellate courts may only consider those issues ruled upon by the trial court:

> Preston requires final orders which clearly identify the scope and the limits of the legal issues in order to assure that appellate courts exercise their proper function of reviewing final judgments of trial courts. See Tenn. Code Ann. § 16-5-108(a)(1) (1994 Repl.). *To present an issue on appeal which was not previously considered and ruled upon by the trial judge would enlarge the appellate court's jurisdiction and involve the court in issuing advisory opinions*. Consequently, before a reviewing court can rule on a certified question of law, the final order must contain a statement of the issue as well as the positions taken by the parties in the trial court. *Review is limited to those issues "passed upon by the trial judge and stated in the certified question . . . ."* State v. Preston, 759 S.W.2d at 650.

State v. James Hooper, No. 03C01-9402-CR-00055, 1994 WL 612413, at *2 (Tenn. Crim. App. Nov. 7, 1994) (emphasis added), perm. to appeal denied (Tenn. Mar. 6, 1995).

Accordingly, we may not consider the defendant's claim that the officers acted illegally in stopping his vehicle, for no determination was made by the trial courts as to this claim.

-11-

We note that the Rutherford County court entered a written order denying the defendant's motion to suppress in which it was summarily included that the "initial detention was appropriate." We agree with this finding. "[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Our supreme court has observed that "courts have repeatedly held that even when police have no basis for suspecting that an individual has committed or is about to commit a crime, the officer may approach an individual in a public place and ask questions without implicating constitutional protections." State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000) (citing Florida v. Bostick, 501 U.S. 429, 434 (1991); Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion); State v. Crutcher, 989 S.W.2d 295, 300 (Tenn. 1999); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993); State v. Moore, 776 S.W.2d 933, 938 (Tenn. 1989); State v. Butler, 795 S.W.2d 680, 685 (Tenn. Crim. App. 1990)). In particular, our supreme court has held that "[a] police officer may approach a car parked in a public place and ask for driver identification and proof of vehicle registration, without any reasonable suspicion of illegal activity." Pulley, 863 S.W.2d at 30.

The record indicates, in the light most favorable to the State, that the officers responded to a noise complaint on public property and that no officer on the scene had activated his patrol lights. Although there was only "[o]ne way in [and] one way out" of the ferry ramp area, "if somebody wanted to leave they could have gone through the field where the Chief parked and got out." Chief Deputy Lankford approached one of the parked vehicles, the defendant's vehicle, and asked C.C., who was in the driver's seat, if he had a license. At that point, Deputy Babcock approached the vehicle and saw marijuana, which gave rise to the subsequent events. In sum, the evidence shows that the defendant was not "seized" by the officers' arrival in the area and approach to the defendant's vehicle.

**Plain View**

Next, the defendant set out claims in his certified question that, for various reasons, the seizure of marijuana from the passenger compartment of his vehicle and photographs of C.C. from a container on the backseat were unlawful.[3] As to this issue, the judges hearing the motions to suppress found that the items seized had been in plain sight and that the

---

[3]In his brief, the defendant argues that the testimony of Deputy Babcock, who testified that he had seen the bag of marijuana as he was standing outside of the defendant's vehicle, was contradicted by that of Chief Deputy Lankford, who testified both that he had not seen anything on the console and did not know what was on the console. If this testimony disputes that of Deputy Babcock, as the defendant argues, the trial judges hearing the testimony resolved the matter by accrediting the testimony of Deputy Babcock.

defendant had consented to the search of this vehicle. The Rutherford County judge concurred, adding that, because the defendant was taken from the scene to the hospital because of a real or faked heart attack, requiring towing of his vehicle, the book containing nude pictures could have been taken pursuant to an inventory search. While the defendant disputes both of these findings, we note that they were based upon the courts' findings that the officers were more credible than the defendant as to the seizures. Testimony presented at the suppression hearings supports these determinations.

As to the motion to suppress the search of the vehicle, which contained the marijuana and on the backseat of which was the book (maybe in a locked box) containing nude photographs of the juvenile, the Smith County judge orally ruled that the marijuana was in plain sight and that the defendant gave permission to search.

### Consent to Search Vehicle

As to the issue of whether the defendant consented to the search of this vehicle, he argues that he "did not knowingly, voluntarily, and intelligently consent to a vehicle search." However, the trial courts resolved the conflicting testimony as to whether the defendant consented to the search by accrediting the testimony of the officers. Likewise, the defendant argues that "a significant question exists as to the scope of the [d]efendant's consent to search and whether such consent applied to locked containers." As to this issue, the courts also accredited the testimony of the officers.

One exception to the warrant requirement is where the defendant gives a voluntary and knowing consent to search. See Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). The voluntariness of the consent is a question of fact determined by examining the totality of the circumstances. State v. Brown, 294 S.W.3d 553, 563 (Tenn. 2009) (citing State v. Cox, 171 S.W.3d 174, 184-85 (Tenn. 2005)). Factors to consider include: (1) time and place of the encounter; (2) whether the encounter was in a public or secluded place; (3) the number of officers present; (4) the degree of hostility; (5) whether weapons were displayed; (6) whether consent was requested; and (7) whether the consenter initiated contact with the police. Id.

The defendant disputed the existence of consent. The trial courts disagreed, finding that the defendant consented to a search of his vehicle. The evidence does not preponderate against the courts' findings. Although the encounter happened after midnight in what would likely be considered a secluded place, there were other individuals in the area with the defendant, there were a few number of officers, and there is no indication of any hostility or display of weapons. Deputy Babcock testified that he asked the defendant if he could search his vehicle, and the defendant "said it was okay." Deputy Babcock found another bag

of marijuana but then stopped the search to attend to the defendant when he started to complain of chest pains. After the ambulance arrived and it was apparent that the defendant was going to leave in the ambulance, Deputy Babcock again asked the defendant for consent, informing him that he could withdraw his earlier consent because he would not be at the scene. However, the defendant again, according to Deputy Babcock, gave permission to search his vehicle. The trial courts accredited Deputy Babcock's testimony, and we will defer to the courts' credibility determinations.

The defendant also contends that even if consent were given, it did not extend to searching the locked container. However, it does not appear that the scope of the defendant's consent was properly reserved in the certified question. The certified question asks whether the warrantless search of the defendant's automobile "was done without lawful consent and was unlawful. . . ." The question does not ask whether the consent extended to the search of a locked container.

The defendant argues in his brief that the plain view, exigent circumstances, and inventory exceptions to the warrant requirement were not applicable to his case. However, he did not specifically include these issues in his certified question. Therefore, these arguments are beyond the scope of the question and will not be addressed. To construe his certified question so broadly to encompass these issues would require this court to essentially conduct a complete overview of search and seizure law, which we decline to do. See State v. Nicholas J. Johnson, No. M2000-03162-CCA-R3-CD, 2001 WL 1356369, at *2 (Tenn. Crim. App. Nov. 6, 2001), perm. to appeal denied (Tenn. Apr. 8, 2002).

## Suppression of Defendant's Statement

We lastly turn to the portion of the defendant's certified question dealing with the fact that the trial courts refused to suppress his subsequent statement to police and the evidence collected during execution of the search warrants obtained based on the materials discovered in the locked box. The defendant asserts that such evidence was subject to suppression as "fruit of the poisonous tree," given that it was the result of the unlawful search of his vehicle. However, we conclude that the trial court did not err in denying these motions because, as determined above, the search of the defendant's vehicle was lawful, meaning that his subsequent statement and evidence from the search warrants were not "fruit of the poisonous tree."[4] In addition, we note that the suppression of the defendant's statement would not be dispositive of the issue, Tenn. R. Crim. P. 37(b)(2)(A), because the victim gave a statement detailing his involvement with the defendant and the locations of their

---

[4]Under the "fruit of the poisonous tree" doctrine, evidence that is obtained through exploitation of an unlawful search or seizure must be suppressed. See Wong Sun v. United States, 371 U.S. 471, 488 (1963).

interactions.[5]

As to the motion to suppress the defendant's statements, the Smith County judge ruled that the defendant had been advised of his rights and waived his right to an attorney. The Rutherford County judge concurred. Subsequently, the Rutherford County court entered a written order, saying that the "[d]efendant's initial detention was appropriate, that the seizure of all evidence was lawful, and that the statement was voluntarily made after the waiver of [d]efendant's <u>Miranda</u> rights."

Lastly, the defendant alleges in his brief that his statement was "taken in violation of the Fifth, Sixth and Fourteenth Amendments" because the officers continued to question him after he requested an attorney. However, this allegation is not clearly within the scope of the defendant's certified question. His broad allegation of "obtained unlawfully" cannot be viewed as encompassing violation of those amendments because doing so would render the scope of the certified question overly broad. <u>See</u> <u>State v. Bradley Hawks</u>, No. W2008-02657-CCA-R3-CD, 2010 WL 597066, at *4-5 (Tenn. Crim. App. Feb. 19, 2010), <u>perm. to appeal denied</u> (Tenn. June 16, 2010); <u>State v. Kale J. Sandusky</u>, No. M2008-00589-CCA-R3-CD, 2009 WL 537526, at *3 (Tenn. Crim. App. Mar. 4, 2009), <u>perm. to appeal denied</u> (Tenn. Aug. 24, 2009).

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we conclude that we are without jurisdiction to consider this matter and, therefore, dismiss the appeal.

_____
ALAN E. GLENN, JUDGE

_____

[5]The certified question does not contemplate why the State could not proceed based upon the testimony of the juvenile victim. The victim's statement is contained in the technical record as an attachment to the State's response to a defense discovery motion.